Is Henry Guardianship of Burdge? ?  Henry isBurdge    Henrywarrior Henry vs. Burdge Henry vs. conten ? Henry vs. Bun ge Barbarian Time to ? ? How to May ? ? ?  First speech Client will receive  of the motion of dismissal. ? ? ? ? Mr. So we're here today because we have two arguments for you all to consider. The first is that that order was violated based on the fact that the court did not make the proper findings under the statutory scheme with regards to the power of attorney in the Illinois Power of Attorney Act. And in the alternative, that the court abuses discretion in appointing Annette and Tina. I will reserve my arguments on the counter appeal for my rebuttal. So starting with the first issue here, the court has the power and has jurisdiction in the case with regard to powers of attorney to proceed to a guardianship if it makes two findings under the Illinois Power of Attorney Act. First, it needs to find that the principal lacks the ability to control or revoke the agency. And second, it needs to find that the agent is not acting for the benefit of the principal or has caused or is threatening to cause some substantial harm. In this case, those findings are not made. The Power of Attorney Act itself actually covers the issues between itself and guardianship proceeding. And it basically states that if the power of attorney is still there, it's not revoked, the court doesn't make those findings in order that guardianship doesn't take precedence over the power of attorney. But... Counsel, what about the argument that the court's order implicitly made those findings? And I think that that's an interesting issue, and if there are good reasons for that or there's actual demonstrable evidence that the court is implicitly revoking that, but I don't think that's a potentially valid argument. I don't think that's the case in our matter, simply because the court actually appointed Butch as guardian of the estate. To revoke his power of attorney and to make those findings that there was some substantial threat of harm that Butch was engaging in or threatening to engage in would negate the court's reasoning in appointing him as control over her estate. But that's one. That's the estate, but then you've got the person. Right. And I understand that. I just don't think that if the court is concerned or is implicitly ruling that Butch would be some sort of threat or potential threat to her, it wouldn't appoint him to control the finances. It seems illogical. And I would note that some of the cases that have been cited are cases that those findings are fairly clear. There's a case where the agent is dissipating the estate. I believe that's Wilson, Enray Estate of Wilson. And obviously in that case, if the court is making that finding and stating, look, these are the reasons for my order, simply just bare bones stating that I'm doing it because A, the person lacks control and capacity, and B, because you're doing this. That's about it. That's what I'm trying to say. Well, is the court's finding, though, that, of course, Butch lives in Texas. Yes, sir. And mom was living with one of the other sisters. And the court made some findings that there were problems with that arrangement, even though perhaps they were close. And therefore, wouldn't that be a separate issue? I mean, the court basically found that Butch still can make financial decisions, but mom shouldn't continue living with this sister, which Butch testified, listen, if I'm the guardian of a person, I'm going to allow mom to continue living with this other sister. Well, I think, Your Honor, that needs a little bit of context. I think Butch is saying, look, I'm going to be controlling the issues with regard to the finances that were alleged throughout the case. But second, I think, and I think actually the trial court even acknowledged the fact that Tori is the daughter of your friend, too, that she was living with. But Tori was not physically causing her harm and, in fact, was dutiful and doting, I think, in the trial court's words, and taking care of Lily. I think the financial concerns are the issue. Now, what Butch is saying is, look, this is my mother, who is moderate to severe Alzheimer's at this point. I'm not going to remove her from the environment unless I feel like there's a danger. And in the current situation, I don't feel like there's that danger. I do believe that he qualified that testimony with, if there is any question that that's going to be the case, that I'm going to do what's best for mom. And he also proposed that if necessary, he would bring mom to Texas to live with himself. So I think he's demonstrating that, you know, he doesn't want to upset the, you know, the current status quo with regard to her mental condition functioning. But I also don't think that there's any allegation. I think even the guardian of your honor stated in this case that the concerns of Toyota's home were that it was messy. Not necessarily that there was some main, you know, threads of imminent serious harm, as far as physical goes. But either event, there's no evidence in this case that Butch engaged in any wrongdoing. No. And Lillian has executed her power of attorney in 2009. Her attorney had actually prepared to testify. But she was of sound mind. She was lucid. She was very adamant that she wanted Butch because she trusted Butch. And I think that Illinois law recognizes a person's right to dictate what's going to happen with their care. In executing that power of attorney, Lillian told us in 2009 that if this becomes an issue, I want my son Butch to handle it. You know, over and above that, even Mr. Hayes testified that there was a letter that went out with regard to some points that she had wanted to illustrate with her daughters. The point here is this is a family that's divided. There's nothing that's going to fix that. Certainly these proceedings may just simply make things worse. But Lillian told us what she wanted. It isn't really about what anybody else wants in this case. And I think that the court has the ability to go past that power of attorney if it makes the right findings, if it has evidence to support that. And, you know, in this case, there's just no evidence that Butch is not the right person. If the only negative is that he lives in Texas, I would submit that that's not enough. I don't think that was even the court's reasoning to the extent that we have it. So, you know, ultimately this case, I think, takes on a little bit bigger of a meaning here. If the court is to find that the power of attorney can simply be discarded without making those findings and without any evidence, it has a chilling effect to the purpose of the Power of Attorney Act in the first place. Why does it exist if one can't explain and dictate that? I think even the guardianship act, you know, references that you can, you know, you're supposed to consider that first and you can go around it, you know, if certain things are met. But, again, I don't think that stuff is met. Lillian's points, I think, just illustrate that she didn't want something like this to happen. She didn't want the stress. She wanted and she trusted Butch to make these decisions. I would, I guess, point the court to the State of Delaware which is cited in our brief. It's mostly analogous to the differences. In our case here, we've got a mother and a son. And in that case, it was a husband and a wife. But in that case, the court found that it was an abuse of discretion to simply avoid it and ignore the power of attorney that existed without making those findings. And it underscores the problem where the court fails to follow what the principle's direction was. So, you know, Lillian told us what she wanted in 2009. I would submit to you all if there's no evidence in the record that suggests that Butch is not capable, that Butch is a serious risk of harm. I think that we've felt some of the concerns with the fact that he's explained to the court that he was going to take control and make sure that we could fix some of the issues but ultimately do what was best for Lillian. So if there are no further questions, I'll... I don't believe so. Thank you, counsel. Thank you. Counsel? Good morning, and may it please the court. My name is Sandra Titonian, and I represent the petitioner and cross appellate Michelle Annette Haggerty. I'll refer to Miss Haggerty as Annette, and I'll refer to all the children. Lillian Burge had eight children, Toya, Tina, Butch, Annette, Andy, Joni, Terry, and Robbie, and that's in order of birth. Both Annette and Butch petitioned the court to be appointed guardian of the person and guardian of the estate of Lillian. The court split the appointment, appointed Annette guardian of the person along with her sister, Tina, and appointed Butch guardian of the estate. The ultimate issue on both the appeal and the cross appeal is whether the judge abused his discretion in his appointment. An additional issue on our cross appeal is whether the court also abused his discretion when it allowed the very person who is the reason we're here as much visitation as it did in its order. Seven of Lillian's children testified over the course of a four-day trial. Four of Lillian's children, Annette, Joni, Tina, and Robbie, all testified about how Toya interfered with their relationship with their mom. She controlled phone calls. She controlled visits between Lillian and her four children. She kept Lillian over-medicated. She lived off of all of Lillian's retirement income. She forged signatures on checks. The house was a disaster. There's questions of whether or not Toya was under the use of Lillian's medication, under the use of marijuana. All these concerns were voiced by four of Lillian's children. All these concerns were voiced to Butch, and Butch did nothing. He stuck his head in the sand and allowed it all to continue to happen from 2009 until 2016, actually 2017, until the court finally removed Lillian from Toya's home and placed her in Annette's home. What year was that? 2017. It was, I believe, after one of the hearings, the first February hearing that he did that, that the judge did that. So concerns were expressed to Butch over the environment of the financial exploitation, and again, Butch did nothing. In fact, as you noted,  with the financial exploitation. He didn't see a problem that Lillian and Toya pooled their money, as Toya explained it, and he was going to keep things the same. He was going to keep Lillian in that environment with Toya. Butch also sent Toya $1,000 a month from one of his corporate bank accounts. We understand that this was to pay Toya for taking care of her mom, but Butch believed that there was no concern in doing this, using his business funds for a personal relationship with his sister. At the close of the testimony, after the fourth day, the judge addressed all the parties, and he noted his concerns about the medications that Lillian was taking. He believed her to be over-medicated. He could not understand why Lillian's three daughters, all of whom have medical degrees, they're all nurses in some form, why they were kept from Lillian and why they could not participate in any of her health care decisions. They weren't even made aware when Lillian would go into a hospital and have to stay for several days. They weren't made aware until after the fact in certain situations. The court found that Toya's control over Lillian and Butch's indifference towards that control over Lillian were just completely unacceptable. The guardian at LIDA filed a report. She filed a preliminary report and then she also gave a final recommendation to the court and that substantiated all the concerns that Annette, Tina, Joni, and Robbie had. The jail reported that Lillian's bedroom was in Toya's dining room, so she had no privacy, that the house was cluttered and messy, the yard was locked, so there was a chain-link fence around Toya's house and she kept a padlock on that so that no one else could enter. She did that to prevent Lillian's other children from being able to get into the house and knock on the door. So she always knew when they were there and she could decide whether or not she was going to allow them to enter the fenced yard. In both her preliminary and final reports, the JAL recommended that Annette be appointed guardian of Lillian's person and that Butch be appointed guardian of Lillian's estate. I believe that what the JAL was trying to do was to kind of appease the two factions because we have four kids on one side and four children on the other side. The JAL recommended that Toya be allowed to visit Lillian for two hours per day for three days per week. To address Mr. Kleinberg's first argument about the jurisdiction, our Illinois Supreme Court, actually, and then Ray Steinfeld, has said that subject matter jurisdiction is the power of the court to hear and determine the particular matter presented to it. It held that jurisdiction to hear and adjudicate disability in guardianship matters is expressly conferred upon the circuit court under Section 11A-3 of the Illinois Probate Act. So upon the filing of the petition, which is what 11A-3 is, the court may adjudge that the person is a disabled person. Upon that finding, then, the court is allowed to appoint a guardian of the person or guardian of the state. So it is that statute that confers the jurisdiction on the probate court. The court acquires jurisdiction over the adult once the petition is served on the disabled adult. Additional jurisdictional requirements or notice has to be sent to all interested parties. There's no dispute in this case that petitions were filed, that Lillian was served 14 days prior to the hearing, and that all interested parties were served. In fact, seven of the children appeared and testified over the course of the four days. We concede there was no petition to terminate the power of attorney for health care, but our position is that the power of attorney for health care was a major point of contention in this case, which not only filed to be guardian of a person in a state, but he also filed a motion to dismiss based on that power of attorney. The court heard argument, the court denied it, denied the motion to dismiss. In a case factually similar to this case, where we have cross petitions for guardianship, where the power of attorney was addressed, both in a motion to dismiss and at the trial, the court, where there's findings, like there were in this case, by the judge, of abuse, control, financial exploitation, the court in Inouye State of Doyle said that the court's appointment of the guardian, who is different than the person that's named under the agent of the power of attorney, it implicitly terminated that power of attorney. And Mr. Klainbother actually conceded that under certain sets of facts that a court can actually implicitly terminate the power of attorney when it appoints a different guardian. Because it's clear that the court had jurisdiction, the question becomes who should be appointed, and that is completely within the court's discretion. And according to 11A.12 of the Probate Act, the court is not bound by the preference of the disabled person, so even though she may have appointed Butch, or named Butch, as her agent of power of attorney, the court's not bound by that. The court has to consider all the facts, the court has to do what's in the best interest of the disabled adult, and that's what the court did in this instance. The fact is that they consider past actions and conduct of the proposed guardians, business experience, ages, and family situation. The overwhelming amount of evidence showed that from 2009 until 2016, Lillian was being financially exploited, she was being controlled by Toya, Butch stepped back and watched and did nothing, that Toya, not Butch, was making actually the health care decisions for Lillian for that period of time, that Toya limited who could visit Lillian, and for those who were lucky to get visits, she dictated when they could visit and how often they could visit. There was testimony of she wanted one sister to visit Lillian on the side of a highway. That was her suggestion of how that sister was able to visit with her own mom. Toya isolated Lillian, kept her from family members, and again, Butch was fine with it. In fact, he admitted he wasn't going to change anything. All of Annette, Tina, and Joni had medical backgrounds, but they weren't allowed to participate in the health care decisions. Each of Tina, Joni, and Robbie testified that they felt that Annette was in the best position to be appointed guardian of the person and guardian of the estate. There was no evidence presented that Annette was not qualified to act as either the guardian of the person or the guardian of the estate. The trial court, after considering all the evidence, after considering what's in the best interest of Lillian, and considering her power of attorney, the court decided that it was in her best interest to appoint Annette as the guardian of the person. Along with that, she also appointed Tina as the co-guardian. We have no problem with Tina being the co-guardian. So the court did not abuse its discretion in appointing Annette and Tina as guardians of the person. The same set of facts that proved that Annette was the correct person to be guardian of the person also proved that Butch should not have been guardian of the estate. No reasonable person would have appointed him knowing that he was okay with commingling his company and personal funds, he was okay with Toya commingling Lillian's funds with her own funds. He had no problem paying Toya each month $1,000 for taking care of his mom from one of his corporate accounts. Butch and Toya, it's clear that they have been aligned from the beginning. They share the same attorney. He's paying her. He has been indifferent to all the concerns expressed by the other children. He should not have been appointed guardian of the estate. And that is where we feel that the judge did abuse his discretion. There's no evidence again presented What difference does it make that he was paying his sister out of his own funds? Well, it's a business decision. So you want someone who's going to be able to make sound business decisions. They're taking care of that person's money. So by him commingling his corporate funds for personal business, that shows that he's subjecting himself to liability and that he has no problem subjecting himself to liability. So if he can't protect himself from personal liability, how does he have the ability to protect Lillian from being subject to any kind of personal liability? So the point is he can't take care of himself financially. How is he going to take care of someone else financially? What's his background? What does he do for a living? He has different corporations. I think it's and Mr. Klineberg can probably testify or tell you more, but he owns his own corporations. I think it's a cleaning business. Right? I'm not sure what it is that he cleans. The point is that Toy was not employed. I don't know why he's paying her $50,000 a month from his own business. He can't make sound financial decisions is really our argument. That's why the court used his discretion. In addition to the use of discretion in appointing Butch versus Annette as guardian of the estate, the court also abused its discretion in granting Toy a visitation with Lillian for three days per week for five hours per day. Toy is the reason we're here today. She's controlled Lillian's every move. She's exploited Lillian financially and she did this for over nine years. The court actually found that Toy had breached fiduciary duties owed to Lillian yet he granted her all this time. It took away duties of the guardian of the person and really limits who they say can visit her, how often they can visit and we believe that the court abuses discretion in that respect as well. To conclude, Annette was appointed guardian of Lillian's person because that was what was in Lillian's best interest and that part of the order should be affirmed. Because it was clear from Butch's testimony that he was fine with the commingling of Lillian's money and Toy's and the use of his corporate money for his personal reasons, the trial court abused its discretion and that part of the order we ask be reversed and we ask that Annette Hagerty be appointed guardian of the estate. Additionally, the part of the order granting Toy a visitation three days per week for five hours per day should be vacated and the co-guardians be allowed to allow such visitation as they determine in the best interest of Lillian. Thank you. Thank you, Counsel. Counsel? Your Honor, just to briefly address, Mr. Burge I think has several corporations one I think is a metal fabrication business, I'm not sure exactly to what degree that's used, but his other is a cleaning, I think chemical manufacturing business I don't know if that's important or here or there but that's my understanding at least there wasn't any testimony about the structure of his corporations or That's okay, Counsel, I was just trying to get a little bit of a reminder of his background as far as you know what his financial background was. Right, I think he's a businessman, he's had several corporations in the past, I think that's in his testimony. Just to address a few things, first I think it's important to point out the trial court really didn't give us any reasoning on what they why he chose what he chose here. We have an order that's a few pages long, but the order just basically states I'm appointing this person and this person guardian of the person and this person guardian of the estate to have the visitations and I'll reserve ruling on holidays and those sorts of things. There's no, you know, I'm doing this because X, Y, and Z and I think maybe part of the issue there is we had the four different non consecutive days of trial some of it cumulative and we had a pretty substantial gap from the time the last witness was sworn and testified to when the court issued the order. The court obviously didn't rule on the person so it's a little bit maybe difficult to speculate as to why the court ruled where they did it, but I would say it seems that we differ a lot and I think the testimony differs on who's responsible for what here. Certainly both sides have presented their case in the trial court. Just to clarify a point, I think that the trial court can implicitly override a power of attorney but I think in doing so it needs to still have that reasoning and make those findings that the  I think that the case law demonstrates that especially in Wilson that case is a bit distinguishable here and I think any of these implicit cases are distinguishable because we're talking about cases where the agent is by the allegations of the court the one that is responsible for the issues that are causing substantial harm. That's different from our case. There's nothing here that illustrates that which is the cause of or is any sort of threat to Lillian. I think in Wilson that was a case where the court actually suspended the POA and then I think just never addressed it after that. But it was appealed on the standards for a TRO with regard to the POA so I can understand how the court would rule in that scenario that there was an implicit overruling because we're dealing and we're talking about the power of attorney itself. So again I thank you for your time. If there are no questions I would simply ask that you reverse the trial court's order to the extent that it or that Nat and Tina be named guardians of the person of Lillian. I don't think there are. Thank you. We appreciate the briefs and arguments of both counsel. We'll take the case under advisement. We'll also take a short recess.